**Marquis Aurbach Coffing**
Terry A. Coffing, Esq.
Nevada Bar No. 4949
Christian T. Balducci, Esq.
Nevada Bar No. 12688
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
tcoffing@maclaw.com
cbalducci@maclaw.com
  *Attorneys for Southern Nevada Health District*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| THE VACCINE CENTER LLC, d/b/a THE VACCINE CENTER AND TRAVEL MEDICINE CLINIC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>GLAXOSMITHKLINE LLC, a Delaware limited liability company; APEXUS, INC., a Delaware corporation; SOUTHERN NEVADA HEALTH DISTRICT; DOES I – X and ROE CORPORATIONS I – X, inclusive,<br><br>Defendants. | Case No.: 2:12-cv-01849-JCM-PAL |

## SOUTHERN NEVADA HEALTH DISTRICT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Southern Nevada Health District, by and through its attorneys of record, Terry A. Coffing, Esq. and Christian T. Balducci, Esq., of the law firm of Marquis Aurbach Coffing, hereby file its Reply in Support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56-1, and the Stipulation and Order entered by this Court [Dkt. #183]. Defendant Southern Nevada Health District (the "Health District") requests that the Court grant summary judgment in its favor and against plaintiff, the Vaccine Center.

/ / / /

MAC:10951-015

This Reply is made and based upon the pleadings and papers on file herein, the Memorandum of Points & Authorities and argument allowed by counsel at the time of hearing. In addition, the Health District hereby joins Defendants GlaxoSmithKline LLC and Apexus, Inc.'s replies and motions for summary judgment in their entirety, including their arguments with respect to immunity as the Health District is a covered entity. The Health District also respectfully requests that this Court set this matter for oral argument.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Despite Plaintiff the Vaccine Center LLC's ("the Vaccine Center") attempt to confuse and conflate, the issue before the Court is simple, straightforward, and purely legal in nature.[1] Namely, does Defendant the Southern Nevada Health District's ("the Health District") acquisition and subsequent administration of vaccines to its clients fit within the Non-Profit Institutions Act's ("NPIA") exemption from Robinson-Patman antitrust liability. See 15 U.S.C. § 13c.[2] That exemption applies when (1) a charitable, not for profit institution utilizes (2) supplies for (3) its "own use." Id. No party disputes the Health District's status as a not for profit institution that qualifies under the NPIA, and all parties agree the vaccines are "supplies" as that term has been defined. As a result, the only remaining question for this Court to decide is whether the Health District's administration of vaccines is for the Health District's "own use."

Both the United States Supreme Court and the 9th Circuit agree that a "use" in furtherance of a covered institution's mission satisfies the "own use" standard. Nevertheless, the Vaccine Center has attempted to twist this clear standard by presenting in excess of twenty-six pages of briefing and more than 100 pages of largely irrelevant exhibits, and wholly ignores binding precedent in opposing the Health District and its co-defendants' motions. The Vaccine

---

[1] This brief focuses on the Non-Profit Institutions Act's exemption from Robinson-Patman antitrust liability. The Health District incorporates the arguments made in its co-defendants' reply briefs as to why summary judgment should also be granted based on antitrust immunity.

[2] "Nothing in the Act approved June 19, 1938, known as the Robinson-Patman Antidiscrimination Act, shall apply to purchases of their supplies for their own use by … charitable institutions not operated for profit."

1  Center's chest-pounding pleading relies on choice snippets from Abbott Laboratories v. Portland
2  Retail Druggists Ass'n, Inc.–and not its holding–to put forth the Vaccine Center's own, self-
3  serving "own use" standard.  See 425 U.S. 1 (1976) ("Abbott Labs").  Put more simply, the
4  Vaccine Center argues that Abbott Labs does not say what it says.  Instead, the Vaccine Center
5  asks the Court to limit "own use" to acquiring and administering supplies to individuals with
6  whom the institution has a pre-existing, patient relationship.  Not only is this contrary to binding
7  precedent, but no court has ever applied such a standard.

8        The Vaccine Center cannot rebut the Health District's basic institutional function, which
9  is to promote, protect, and preserve "the health, the environment and well-being of Southern
10 Nevada residents and visitors,"[3] and to prevent and control the spread of communicable diseases
11 throughout Clark County, Nevada.  As vaccines are among the most effective way to control the
12 transmission of disease, there can be no dispute that the Health District's acquisition and
13 administration of vaccines furthers the Health District's basic institutional function, thus
14 requiring summary judgment.  The Vaccine Center is also incapable of controverting the fact that
15 the immunity arguments presented by the Heath District's co-defendants apply equally to the
16 Health District.  Toward this end, it is the Vaccine Center's pleading that is "self-defeating."  As
17 a result, this Court should grant the Health District's motion for summary judgment.

18  / / /
19  / / /
20  / / /
21  / / /

---

[3] See the Health District Mission Statement, the Health District, *available at* http://www.southernnevadahealthdistrict.org/.  As this website is produced by the Health District, a source whose accuracy cannot reasonably be questioned, this Court may take judicial notice of the website and its contents for the purpose of this motion.  See NRS 47.130; see also NRS 47.140; and see NRS 47.150; Fed. R. Evid. 201(b) (noting that a Court shall take judicial notice if requested and supplied with the necessary information); accord Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173 (S.D.N.Y. 2006) (noting courts may take judicial notice of information on a party's website); Town of Southold v. Town of East Hampton, 406 F. Supp. 2d 227 (E.D.N.Y. 2005).  These documents are also admissible, and thus may be considered by this Court, in accord with Fed. R. Evidence 902(5) (noting that publications purporting to be published by a public authority are self-authenticating).  The same holds true for each website and report referenced herein.

## II.  STATEMENT OF UNDISPUTED FACTS

The Health District, Defendant GlaxoSmithKline LLC ("GSK") and Defendant Apexus, Inc.'s ("Apexus") motions for summary judgment presented this Court with facts supported by admissible evidence that the Vaccine Center did not dispute. Rather than provide any substantive information, the Vaccine Center's opposition employs a smoke and mirrors campaign replete with misplaced citations to the Social Security Act, conflations between the 340B program and the Prime Vendor Program, speculative and hearsay statements by the Vaccine Center's principal, and mischaracterizations with respect to the Health District's clients. The Vaccine Center's innuendo aside, the following, brief set of facts clarifies the undisputed facts critical "to the disposition of the motion." See LR 56-1.

### A.  THE HEALTH DISTRICT, ITS MISSION, ITS CLIENTS, AND ITS STATUS AS AN INSTITUTION-OPERATED NOT FOR PROFIT.

The Health District is a political subdivision of the state of Nevada formed pursuant to NRS 439.362 and empowered by NRS 439.366 to have jurisdiction over *all* public health matters in Clark County. The Health District's mission is "to protect and promote the health, the environment and the well-being of Clark County residents and visitors."[4] This mission is confirmed by the Clark County Code, which directs the Health District "to take whatever action that is necessary to control communicable diseases." Clark County Code § 3.08.070(b). And, NRS 439.366 requires the Health District to "[r]egulate sanitation and sanitary practices in the interests of public health, [p]rovide for sanitary protection of water and food supplies, [p]rotect and promote the public health…" NRS 439.366(3). More importantly, the Health District is required to "take such measures for the prevention, suppression and control of [communicable] disease[s] as are required." NRS 441A.160. To close this loop as Clark County's health authority, the Health District is statutorily charged with the strict enforcement of public health within its jurisdiction. NRS 439.550(1).

///

---

[4] See the Health District Mission Statement, *available at* http://www.southernnevadahealthdistrict.org/.

The Health District's obligation to protect and promote public health does not discriminate between income, gender, socio-economic background, or race. As such, the Health District's obligations flow to all of its clients, which include everyone within its jurisdictional boundaries, and apply equally to travelers within Clark County. As a nonprofit, political subdivision, the Health District provides services to everyone regardless of their ability to pay. See Declaration of Ms. Sorenson ¶3, **Exhibit A**. Importantly, the Vaccine Center does not dispute the fact that the Health District qualifies as a charitable institution operated "not for profit" as contemplated by the Non-Profit Institutions Act ("NPIA"). See 15 U.S.C. § 13c.

Although the scope of the Health District's obligations might appear expansive at first blush, a brief review of the Health District's purpose demonstrates that the Health District has one, narrow focus: Public Health. As a political subdivision tasked with public health, the Health District is committed and required to secure a sufficient level of health for the community at large. Indeed, public health services often go unnoticed within a community because they are often proactive and preventive versus reactive. By way of example, the Health District's involvement in the Hepatitis disease investigation stemming from the Endoscopy Center's practices is well known.[5]

By contrast, how many people know the number of tuberculosis patients seen, investigated, and and/or treated by the Health District annually? For that matter, how many people know the number of TB investigations conducted and individuals treated by the Health District involving persons who live outside of the state or on international soil? As exemplified by the Ebola outbreak in Africa, which has now made its way to the United States, collective action to promote and protect population health also occurs at the global level and the importance of the availability and the administration of travel vaccines becomes urgently clear. The nuance of public health is that although the vaccine may be given to an individual, it is given for the protection of the many, which here, is for the protection of everyone within and

---

[5] See, e.g., Public Health Investigation Report, Outbreak of Hepatitis C at Outpatient Surgical Centers, *available at* http://www.southernnevadahealthdistrict.org/download/outbreaks/final-hepc-investigation-report.pdf.

MAC:10951-015

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

throughout Clark County.  In other words, the vaccinations are administered for the protection of the *public*.  Public health is the sum of the collective health of the individuals served in the community.  Toward this end, the Health District serves more than 2 million Nevada residents (approximately 73% of residents within the state of Nevada) and administers approximately 170,726 childhood and adult immunizations each year.  See Declaration of Ms. Sorenson ¶3, **Exhibit A**.

### B. THE HEALTH DISTRICT ABIDES BY ITS STATUTORY MANDATE AND ITS DUTY TO PROMOTE AND PROTECT PUBLIC HEALTH AMONGST ITS CLIENTS BY ACQUIRING THE VACCINES AS SUPPLIES.

To prevent the spread of communicable disease, the Health District, as a "covered entity" under the federal 340B Drug Pricing Program, purchased vaccines from GSK pursuant to the Prime Vendor Program.  See Declaration of Ms. Sorenson ¶11, **Exhibit A**.  The health of Clark County residents bears both an economic and human cost.  The burden the poor health of a population exerts on a community impacts such tangible factors as employment and health care costs and intangible factors such as quality of life.  Whether tangible or intangible, these factors are universally important to the overall and sustained health of any community.  Whether old or young, wealthy or indigent, traveling or staying home – timely immunizations are one of the most important tools in public health's arsenal.  So, in furtherance of its basic institutional function, the Health District offers vaccinations to all within Clark County, regardless of socio-economic background or race.

Providing vaccinations "is a core public health function, a vital public health tool, and one of the most cost-effective public health-promoting interventions a public health authority … can perform."  Id. ¶10.  The Vaccine Center's opposition is peppered with innuendo and argument that the Health District should only immunize the poor and the indigent.  In other words, the Vaccine Center argues that public health is not served when wealthy travelers are immunized by the Health District.  Such a narrow position, however, fails to consider that a vaccine is more than just a vaccine–it immunizes a disease-susceptible individual from the public at large, one vaccine at a time.

MAC:10951-015

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Vaccinations are not only the Health District's independent choice and process; but providing and administering vaccinations is consistent with the Center for Disease Control and Prevention's ("CDC") position; particularly as the CDC has determined that vaccinations are the number one public health achievement of the last century.[6] The Health District does not "sell" or "resell" vaccinations for profit. Instead, the Health District administers vaccines, at cost in exchange for a meager administrative fee. Id. ¶12. The administrative fee is deposited into a fund designated for the Health District's operations and programs. Id. ¶3. Regardless of price paid, the Health District's function as a public health department requires that it meet the needs of the public; which of course, includes vaccinations in order for communicable disease to be suppressed and controlled.

As a result, persons vaccinated by the Health District are not "walk-in, walk-out" pharmaceutical customers that lack a relationship with the Health District. Instead, individuals vaccinated by the Health District are clients that have a relationship with the Health District, the governmental body charged to ensure public health within and throughout Clark County. Any determination otherwise would directly call into the question the duties and responsibilities that flow by and between a health district and its populace.

As stated, and undisputed, the Health District acquired a number of vaccinations through the Prime Vendor Program – not the 340B Program. Despite the Vaccine Center's disingenuous attempt to assert the Health District and its purchases were made under the 340B Program, the Vaccine Center acknowledges the vaccinations purchased by the Health District qualify as "supplies" under the Non-Profit Institutions Act ("NPIA"). See 15 U.S.C. § 13c; Logan Lanes v. Brunswick Corp., 378 F.2d 212, 216 (1967), cert. denied, 389 U.S. 893 (1967); see also Abbott Laboratories, 425 U.S. 1 at 5 (noting the district court ruled that purchases of pharmaceuticals were purchases of "supplies" for the hospitals' "own use.").

/ / /

---

[6] See Ten Great Public Health Achievements-United States, 1900-1999, CDC, *available at* http://www.cdc.gov/mmwr/PDF/wk/mm4812.pdf, page 247, "Vaccines are one of the greatest achievements of biomedical science and public health."

MAC:10951-015

## III. LEGAL ARGUMENT

The NPIA exempts the Health District's vaccine purchases from prosecution under Robinson-Patman by providing, "[n]othing in the ... Robinson-Patman Antidiscrimination Act, shall apply to purchases of their supplies for their own use by ... hospitals, and charitable institutions not operated for profit." See 15 U.S.C. § 13c. Because the NPIA exempts the Health District from liability under Robinson-Patman, the Health District is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Under Supreme Court and 9th Circuit precedent, the standard for "own use" is clear: whether the challenged conduct furthers the *institution's* charitable function. As the Health District's basic institutional function is to protect public health and control disease, the purchase and administration of vaccinations to its clients furthers this function and falls squarely within its "own use" as contemplated by law.

Accordingly, this Court should grant the Health District's motion for summary judgment because (A) the Vaccine Center's presentation of Abbott Labs is wholly incorrect and should be ignored; (B) the correct application of Abbott Labs makes clear that the Health District's conduct fits squarely within the NPIA's exemption; (C) binding, "own use" precedent confirms that summary judgment is required; and (D) the Health District can claim and is entitled to antitrust immunity. Because the record is clear that the Vaccine Center's "antitrust claims cannot succeed," summary judgment in the Health District's favor is appropriate. See Wigod v. Chicago Mercantile Exchange, 981 F.2d 1510, 1514–15 (7th Cir. 1992).

### A. THE VACCINE CENTER MISAPPLIES ABBOTT LABS.

The Health District's vaccine purchases under the Nonprofit Institutions Act are entirely consistent with Supreme Court precedent. According to the Vaccine Center, the Health District's use of vaccines only qualifies as "own use" if vaccines are administered to individuals with a pre-existing "patient" relationship with the Health District. See the Vaccine Center's Opposition at pg. 1, ll. 4–5, [Dkt. #170]. In so arguing, the Vaccine Center quotes snippets from Abbott Labs and ignores the actual standard established by the Supreme Court: that "own use" must be assessed with reference to an entity's "institutional function." See Abbott Labs, 425

MAC:10951-015

U.S. at 14. Indeed, a complete read of Abbott Labs reveals its holding, which makes this point crystal clear:

> … that the test is the obvious one inherent in the language of the statute, namely, "purchases of their supplies for their own use"; and that "their own use" is what reasonably may be regarded as use by the hospital in the sense that such ***use is a part of and promotes the hospital's intended institutional operation*** in the care of persons who are its patients.

Id. (emphasis added). Thus, pursuant to Abbott Labs, an institution acquires and employs supplies for its "own use" when the use "is a part of and promotes the [institution's] intended institutional operation in the care of persons who are its [clients]." Id. Accordingly, the "own use" test simply seeks to determine whether an institution is utilizing supplies for its institution-specific core function. Vaccinations of the public within Clark County, which promotes the public health, is unquestionably part of and promotes the Health District's intended institutional operation.

The Vaccine Center's continued reliance on the existence of a "patient" relationship is entirely misplaced and defies the plain language of the NPIA exemption. The NPIA's exemption applies to libraries, universities, and not for profit institutions such as the Health District–not just hospitals. See 15 U.S.C. § 13c. Applying the Vaccine Center's "patient" standard to institutions other than hospitals amply displays the incorrect nature of the Vaccine Center's logic. Indeed, applying the Vaccine Center's logic would hold public libraries that acquire books at a discounted price liable under the Robinson-Patman Act because ***anyone*** can walk into a public library. The Vaccine Center's logic would also hold an academic university liable for obtaining bowling equipment at a discounted rate. The Vaccine Center's logic would further hold a school liable for acquiring dairy products for its school lunch program at a discounted rate.

Such conclusions have already been determined to be inaccurate and contrary to the actual "own use" standard. See Logan Lanes, Inc. v. Brunswick Corp., 378 F.2d 212 (9th Cir. 1967) (University's acquisition of discounted bowling equipment and subsequent sale of tickets exempt from Robinson-Patman Act liability under the NPIA because student entertainment is part and parcel of a University's function); Lago & Sons Dairy, Inc. v. H.P. Hood, Inc., 1994 WL 484306, No. Civ. 92-200-CD (D. N.H. Sept. 6, 1994) ("During the time period relevant to

1  this action, Hood sold its dairy products to certain nonprofit schools.  The forms which Hood
2  uses to bid on school accounts generally state that the milk is to be used for the school lunch
3  program.  There is no evidence before the court to suggest that the dairy products sold by Hood
4  to nonprofit schools were used for any purpose other than consumption by school children."
5  (internal citations omitted)).  The point made by these three examples is simple: the Vaccine
6  Center's standard does not work for institutions *other than* hospitals.  There is no dispute that a
7  public library does not have patients.  Neither does a university, neither does a school, and
8  neither does the Health District.  Taken together, the Vaccine Center's version of the "own use"
9  test is a tortured interpretation of a clearly defined concept.  The application of the correct "own
10 use" standard requires summary judgment in Health District's favor.

### B.  ABBOTT LABS REQUIRES SUMMARY JUDGMENT IN THE HEALTH DISTRICT'S FAVOR.

13  To countenance the Vaccine Center's argument that the Health District's vaccine
14 purchases were not for its own use, this Court would be required to hold that immunizing the
15 public against disease is not a part of and does not promote the Health District's "intended
16 institutional operation."  Abbott Labs, 425 U.S. at 14.  In other words, to find in favor of the
17 Vaccine Center, this Court would have to reach a conclusion contrary to that which the Supreme
18 Court reached more than one hundred years ago when it approved of a publicly funded
19 mandatory vaccination program and noted the history and tradition of such programs: "[s]tate-
20 supported facilities for vaccination began in England in 1808 with the National Vaccine
21 Establishment."  Jacobson v. Cmmw. of Massachusetts, 197 U.S. 11, 33 (1905).  But, the law has
22 supported a health district's own use of vaccines as part and parcel of furthering public health for
23 more than a century.  Id.

24  Disease does not discriminate. As such, every socio-economic class, race, gender, adult
25 and child is equally capable of contracting and transmitting communicable diseases within and
26 throughout Clark County.  The Health District does not discriminate.  The Health District fulfills
27 its institutional function by purchasing and administering vaccines to individuals for the benefit
28 of the entire community, in furtherance of its institutional function of public health.  The former

agreements the Health District had with community businesses is not inconsistent with the Health District's institutional function, but in furtherance of it. The inoculated individuals were, without any doubt, situated within the Health District's jurisdictional territory and part of its public.

According to the Center for Disease Control and Prevention, public health vaccine delivery systems must be extended to adolescents and adults.[7] Each year, thousands of cases of potentially preventable influenza, pneumococcal disease, and hepatitis B occur within the adolescent and adult population. Id. For example, the Health District has tracked a decrease of hepatitis B rates from 3.93 cases per 100,000 per year in 2003 down to 1 case per 100,000 per year in 2013 and yet, the immunization rates have not significantly increased in adults in the last ten years.[8] This statistic demonstrates that immunizations of the public, even at a consistent rate year-to-year, results in a public that is increasingly immune, and decreasingly susceptible. As more adults within the community, including casino employees, are inoculated against hepatitis B (which does not need repetitive administration), the less frequent the cases of hepatitis B become. This, ultimately, increases the public's health for Clark County residents and visitors.

Accordingly, the acquisition and administration of vaccinations to any individual within Clark County (which are all the Health District clients) is part and parcel of the Health District's intended institutional operation of promoting public health and controlling communicable diseases, and fits squarely within the "own use" standard as defined by Abbott Labs. Consequently, this Court should grant the Health District's motion for summary judgment.

///
///
///
///

---

[7] See Ten Great Public Health Achievements-United States, 1900-1999, CDC, *available at* http://www.cdc.gov/mmwr/PDF/wk/mm4812.pdf.

[8] See Clark County Disease Statistics, SNHD's website *available at* http://www.southernnevadahealthdistrict.org/stats-reports/disease-statistics-annual-graphs02-13.php

MAC:10951-015

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### C.   "OWN USE" PRECEDENT REQUIRES SUMMARY JUDGMENT.

Not only does Abbott Labs support summary judgment in the Health District's favor, but precedent requires it. More specifically, the Ninth Circuit's De Modena decision and the FTC's St. John's Health[9] opinion specifically addressed the attenuation between the purchaser and the end-user. De Modena v. Kaiser Found. Health Plan, Inc., 743 F.2d 1388, 1393 (9th Cir. 1984). In both opinions, each of which used Abbott Labs as the analytical starting point, the determination of "own use" rested on "what reasonably may be regarded as use [by the eligible institution] in the sense that such use is a part of and promotes [its] intended institutional operation." See De Modena, 743 F.2d at 1393 (quoting Abbott Labs, 425 U.S. at 14); see also St. John's (n.10 herein) at pg. 2 (quoting Abbott Labs, 425 U.S. at 14). Critically, and in contrast with the Vaccine Center's assertions, the focus is on the intended institutional operation–not on whether a patient relationship exists.

Given the fact that the NPIA's exemption includes hospitals, charities, libraries, and institutions, the "own use" test is flexible, accommodating to each respective institution, and must be analyzed on a case-by-case basis. See, e.g., Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992) (noting that courts must consider antitrust actions on a case-by-case basis). A holistic review of "own use" precedent confirms this:

| Institution | Case & Court | Allegation | Holding |
| --- | --- | --- | --- |
| Hospital | Abbott Labs, 425 U.S. 1 | Alleged: Hospital's purchase and use of pharmaceutical products was not for the hospital's "own use" per the NPIA. | "[O]wn use is what reasonably may be regarded as use by the entity in the sense that such use is part of and promotes the entity's intended institutional operation."[10]<br><br>Therein, the Court approved of every use of products at issue "short of the refill."[11] |
|  |  |  |  |

---

[9] See September 13, 2006 St. John's Health System Advisory Opinion, F.T.C., *available at* http://www.ftc.gov/sites/default/files/documents/advisory-opinions/st.johns-health-system/060913stjohnsadvisoryopinion.pdf.

[10] Abbott Labs, 425 U.S. at 14
[11] Id. at 15.

MAC:10951-015

| | | | |
|---|---|---|---|
| HMO | De Modena, 743 F.2d 1388 | Alleged: Kaiser Foundation Hospitals purchase and resale of drugs to plan members was not for Kaiser's "own use" within the meaning of the NPIA. | "[T]o follow the true mandate of Abbott Labs we should not simply adopt the categorical rules set forth in that decision, but should instead ***determine the basic institutional function*** of the . . . Medical Care Program and then decide which sales are in keeping with this function."[12]<br><br>"[HMO's]. . . are designed to provide a complete panoply of health care to their members ... Given this extraordinary broad institutional function, any sale of drugs by an HMO to one of its members falls within the basic HMO function ... [D]rugs purchased by an HMO ... for resale to its members are purchased for the HMO's "own use" within the meaning of the NPIA.[13] |
| Health District | Travel Medicine Clinic v. Southern Nevada Health District | Alleged: Health District's purchase and use of vaccines to immunize the public is not a purchase for the Health District's "own use." | The Health District is designed and required to further public health within and through Clark County. As part of parcel of this institutional function, the Health District must define and control communicable disease.<br><br>Given this broad institutional function, any sale or administration of vaccinations by the Health District to a member of the public falls within its basic, institutional function.<br><br>Thus, vaccinations acquired by the Health District for administration to the public are purchased for the Health District's "own use" within the meaning of the NPIA. |

The Health District's mission and function is "to protect and promote the health, the environment and the well-being of Clark County residents and visitors."[14]  This mission is confirmed by the Clark County Code which directs the Health District "to take whatever action that is necessary to control communicable diseases."  Clark County Code § 3.08.070(b); accord NRS 441A.160.  Given this broad institutional function, any administration of vaccinations by

---

[12] De Modena, 743 F.2d at 1393 (emphasis added).

[13] Id.

[14] See the Health District Mission Statement, *available at* http://www.southernnevadahealthdistrict.org/.

MAC:10951-015

the Health District to a member of the public falls within its basic, institutional function. Such a conclusion is coterminous with Abbott Labs, De Modena, and Jacobson.[15]

Thus, vaccinations acquired by the Health District for administration to the public are purchased for the Health District's "own use" within the meaning of the NPIA. As a result, this Court should grant summary judgment in favor of the Health District.

### D.  THE IMMUNITY ASSERTED BY APEXUS AND GSK APPLIES EQUALLY TO THE HEALTH DISTRICT.

The immunity arguments asserted by Apexus and GSK, which include conduct-based immunity, apply equally to the Health District and bar the Vaccine Center's suit in its entirety. Rather than resuscitate the thorough arguments presented by Apexus and GSK, their immunity arguments are hereby incorporated herein. In opposition, the Vaccine Center presented only two points in opposition to the Health District's assertion of immunity. Specifically, the Vaccine Center contends the Health District is not entitled to immunity because there is no legal basis, and that the Health District's actions are inconsistent with the 340B Program. The Vaccine Center, however, is wrong on both accounts. See the Vaccine Center's Opposition at pg. 25, ll. 11–20, [Dkt. #170].

Pursuant to Byers, which the Vaccine Center conveniently ignores, a party's conduct is immune when (1) a government agency acts pursuant to a clearly defined policy or program, and (2) the party is acting at the consent of the government agency. See Byers v. Intuit, 600 F.3d 286 (3rd Cir. 2010). Here, Apexus unquestionably acted in accord with the Prime Vendor Program. In offering the vaccinations to the Health District, so too did GSK. The Health District, undisputedly, is a covered entity that acquired vaccinations from GSK through the Prime Vendor Program at the federal government's behest. That, ultimately, satisfies the very definition of conduct-based immunity. Accordingly, a legal basis for the extension of conduct-based immunity to the Health District exists and confirms that the Health District is immune.

///

---

[15] 197 U.S. 11.

MAC:10951-015

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Moreover, the Vaccine Center's assertion that the Health District's acquisition of vaccines contradicts the 340B Program's purpose is false. Putting aside the fact that the Health District acquired vaccinations through the Prime Vendor Program, the Health Resources and Services Administration instructed Apexus that vaccinations could be included in the Prime Vendor contract if it constituted a value added product. See Declaration of Cpt. Mitchell ¶13, attached as Exhibit C to Apexus' motion [Dkt. #158]. Critically, there is no dispute that vaccinations are value added products. Consequently, the Vaccine Center's unfounded assertion should be ignored, and summary judgment should be granted in the Health District's favor.

## IV.   CONCLUSION

The Health District's motion for summary judgment should be granted. This truly is a misplaced suit by the Vaccine Center, which seeks profit over public health. In order to breathe "some" life into its case, the Vaccine Center has presented this Court with contentions that no court has ever adopted. Indeed, every court agrees that a charitable, not for profit institution is exempt from Robinson-Patman liability when it acquires supplies in furtherance of its intended institutional function. As a political subdivision of the state of Nevada mandated to promote and protect public health, and mandated to prevent the spread of communicable disease, the Health District's purchase and administration of vaccines to the public it serves is in furtherance of the Health District's "own use" and consistent with its basic institutional function. In addition, Apexus and GSK's immunity arguments apply equally to the Health District. This Court should, therefore, grant summary judgment in the Health District's favor.

Dated this 8th day of October, 2014.

MARQUIS AURBACH COFFING

By */s/Christian T. Balducci*
   Terry A. Coffing, Esq.
   Nevada Bar No. 4949
   Christian T. Balducci, Esq.
   Nevada Bar No. 12688
   10001 Park Run Drive
   Las Vegas, Nevada 89145
   *Attorneys for Southern Nevada Health District*

MAC:10951-015

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the service of the foregoing ***DEFENDANT SOUTHERN NEVADA HEALTH DISTRICT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT*** was made on the 8th day of October, 2014, via the United States District Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

                                           */s/Cheryl Becnel*
                                           An employee of Marquis Aurbach Coffing

**MARQUIS AURBACH COFFING**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:10951-015