UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| VACCINE CENTER, LLC,<br><br>            Plaintiff,<br><br>  v.<br><br>GLAXOSMITHKLINE LLC, et al.,<br><br>            Defendants. | Case No. 2:12-cv-01849-JCM-NJK<br><br>ORDER |

        Presently before the court is defendant Apexus, Inc.'s (hereinafter "Apexus") motion for summary judgment. (Doc. # 158). Plaintiff Vaccine Center LLC (hereinafter "plaintiff") filed a response, (doc. # 170), and Apexus filed a reply, (doc. # 179).

        Also before the court is defendant Southern Nevada Health District's (hereinafter "SNHD") motion for summary judgment. (Doc. # 161). Plaintiff filed a response, (doc. # 170), and SNHD filed a reply, (doc. # 185).

        Also before the court is defendant GlaxoSmithKline, Inc.'s (hereinafter "GSK") amended motion for summary judgment. (Doc. # 168). Plaintiff filed a response, (doc. # 170), and GSK filed a reply, (doc. # 182).

        Also before the court is Apexus's motion to strike. (Doc. # 180). Plaintiff filed a response, (doc. # 187), and Apexus filed a reply, (doc. # 188).

**I.    Background**

        The instant case arises from a program developed by the Department of Health and Human Services ("HHS"), through the U.S. Health Resources and Services Administration ("HRSA") and Office of Pharmacy Affairs ("OPA").

        The prime vendor program authorizes the secretary of HHS to enter into agreements with drug manufacturers establishing price ceilings for drugs purchased by certain covered entities. *See*

42 U.S.C. § 256b. HRSA selects a prime vendor every five years to implement the program on its behalf. Covered entities contract with the prime vendor to obtain drugs from manufacturers at or below the established ceiling prices.

Defendants all play a role in distributing vaccines pursuant to the prime vendor program. In 2009, HRSA selected Apexus as its prime vendor. In this capacity, Apexus is responsible for negotiating pharmaceutical pricing and establishing a distribution center for the program. GSK is a pharmaceutical company that sells vaccines to medical providers through the prime vendor program. SNHD is a public health agency and a covered entity under the prime vendor program.

On or about January 25, 2008, SNHD entered into a prime vendor participation agreement with Apexus. This enabled SNHD to purchase certain drugs from manufacturers, specifically GSK, at discounted prices negotiated by Apexus.

Plaintiff operates a private medical clinic in Nevada and also purchases vaccines from GSK. Because plaintiff is a private, for-profit entity, it does not qualify for the prime vendor program rates and therefore must pay higher prices than those SNHD pays. Plaintiff alleges that its business has been harmed by defendants' misuse of the prime vendor program.

In the instant action, plaintiff alleges that defendants have violated certain antitrust laws. (Doc. # 154). Plaintiff brings claims against SNHD for (1) receipt of discriminatory prices under the Robinson-Patman Act, (2) violations of the Nevada Unfair Trade Practice Act, and (3) intentional interference with prospective economic advantage. (Doc. # 154).

Plaintiff's complaint also includes a claim against GSK for price discrimination under the Robinson-Patman Act. Finally, plaintiff asserts claims against Apexus for aiding and abetting its co-defendants' alleged violations of the Robinson-Patman Act. (Doc. # 154).

Defendants now move for summary judgment on the claims against them under the Robinson-Patman Act, arguing that (1) they are entitled to implied conduct-based immunity, or (2) their conduct falls within the own-use exemption to the Robinson-Patman Act.

**II.  Legal Standard**

    A.    *Summary judgment*

The Federal Rules of Civil Procedure allow summary judgment when the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323-24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

### B. The Robinson-Patman Act

Under the Robinson-Patman Price Discrimination Act (the "Robinson-Patman Act"), it is unlawful for a seller engaged in commerce to discriminate in price between different purchasers of like commodities where "the effect . . . may be to substantially lessen competition." 15 U.S.C. § 13(a).

The Nonprofit Institutions Act ("NPIA") exempts from the Robinson-Patman Act any "purchases of their supplies for their own use by . . . hospitals, and charitable institutions not operated for profit." 15 U.S.C. § 13c. The Supreme Court has held that "the antitrust laws, and Robinson-Patman in particular, are to be construed liberally, and that the exceptions from their application are to be construed strictly." *Abbott Labs. v. Portland Retail Druggist Ass'n, Inc.*, 425 U.S. 1, 11 (1976) (citations omitted).

### C. Motion to strike

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The court may do so "on motion made by a party . . . within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f)(2).

## III. Discussion

### A. Implied immunity

Apexus argues that it is immune from plaintiff's claims under the doctrine of conduct-based immunity. Apexus states that because its proposal to the HRSA included vaccines and its contract requires it to work in accordance with its proposal, its administration of discounted vaccines is explicitly directed by the government.

Plaintiff responds that Apexus is not entitled to conduct-based immunity because vaccines are not covered by the prime vendor program. Apexus maintains that if vaccines are not specifically excluded from the program, the agency's decision to include them is entitled to *Chevron* deference.

Agencies and branches of the federal government are not subject to the antitrust laws. *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 745-46 (2004). However, "[i]mmunity from the antitrust laws is not lightly implied." *California v. Fed. Power Comm'n*, 369 U.S. 482, 485 (1962). "Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) (looking to legislative history for congressional intent to insulate parties from antitrust liability).

As the Ninth Circuit has stated, "[i]mmunity is especially disfavored where the antitrust implications of a business decision are neither compelled nor explicitly approved by a government regulatory body." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1056 (9th Cir. 1983) (finding that pervasive congressional regulation of an industry is insufficient to confer blanket implied immunity of private industry actors). According to the Supreme Court, "[i]mplied antitrust immunity can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system . . . ." *United States v. Nat'l Ass'n of Sec. Dealers*, 422 U.S. 694, 719-20 (1975).

Nevertheless, federal courts have applied conduct-based implied antitrust immunity to the actions of private entities acting pursuant to the government's direction. *See, e.g.*, *Byers v. Intuit, Inc.*, 600 F.3d 286, 294-95 (3d Cir. 2010) (affirming summary judgment on grounds of immunity from Sherman Act claims arising from ceiling provisions of agreement with IRS); *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 582 (2d Cir. 2000) (upholding 12(b)(6) dismissal where challenged conduct was explicitly compelled by terms of agreement with government agency); *see also Flamingo Indus. (USA) Ltd. v. U.S. Postal Serv.*, 302 F.3d 985, 993 (9th Cir. 2002) (acknowledging that conduct-based immunity may be afforded for private action "at the direction of a federal sovereign") (reversed on other grounds). "[W]here conduct is compelled by the regulatory agency, not implying antitrust immunity would be unfair to the regulated entity and would frustrate agency policies." *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716, 733 (9th Cir. 1981).

Whether implied immunity covers a particular defendant is a fact-intensive inquiry turning

5

on the circumstances of each particular case. *See, e.g.*, *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716, 731-32 (9th Cir. 1981) (reversing and remanding dismissal on implied immunity grounds where FCC permitted tariff to go into effect but did not compel it). "Such immunity is provided to a private party acting anti-competitively pursuant to an agreement with a government agency when: (1) the government agency is acting pursuant to a clearly defined policy or program; and (2) the private party is acting at the direction or consent of the government agency." *Byers*, 600 F.3d at 295. The Supreme Court has found implied immunity where the Securities and Exchange Commission fixed rates pursuant to a particular statutory section and private parties acted in accordance with the rates system. *Gordon et al. v. New York Stock Exch.*, 422 U.S. 659, 689-90 (1975).

Plaintiff argues that the Ninth Circuit's holding in *Phonetele* governs the facts here, but that case is distinguishable. 664 F.2d at 733. The *Phonetele* defendants argued that they were entitled to implied immunity because the FCC permitted the tariff at issue to go into effect. The court noted that the FCC does not give specific approval to each tariff, and that because this conduct was not expressly condoned by a regulatory agency, it was not entitled to implied immunity. *Id.* The arguably more stringent *Phonetele* factors apply only in determining whether antitrust immunity stems from a regulatory scheme set forth by Congress.

By contrast, Apexus seeks conduct-based immunity pursuant to an explicit agreement with a federal agency. The conduct at issue here occurred pursuant to Apexus's contract with HRSA, which expressly adopts the terms of Apexus's bid. This makes the instant case more like *Byers* and *Name.Space*, in which other circuits found private parties impliedly immune when they were acting pursuant to government contracts.

As defendants note, HHS has explicitly indicated that vaccines may be included under the prime vendor program as "value-added services." (Doc. # 168). HHS's justification of estimates for appropriations committees states that the prime vendor program covers "contracts for other value-added pharmacy products and services such as vaccines . . . ." (Doc. # 168-7).

The parties do not dispute the purpose of the prime vendor agreement to provide pharmaceuticals at discounted rates. In the course of deciding on a prime vendor, HRSA accepted

bids from private parties.  Apexus's prime vendor solicitation listed a number of vaccines to be made available from manufacturers, including GSK, at discounted rates.  (Doc. # 158, ex. B). HRSA then selected Apexus as the prime vendor.  The parties' prime vendor agreement specifies that Apexus "shall, in meeting the requirements of this Agreement, perform the work in accordance with the proposal to the Health Resources and Services Administration dated April 16, 2009 . . . ." (Doc. # 158, ex. A).

Pursuant to the foregoing, the court finds that there is no genuine dispute of material fact regarding whether vaccines may be administered pursuant to the prime vendor program.  Based on the facts as set forth above, it would be unreasonable to subject Apexus to antitrust liability. Apexus received authorization from HRSA to provide vaccines through the acceptance of its bid and the terms of the prime vendor contract.

Plaintiff incorrectly argues that the exception set forth in *Otter Tail* applies to this case. *Otter Tail* presents an exception to the doctrine of implied immunity where a party insists on anti-competitive restrictions that hinder the government.  410 U.S. at 379.  Plaintiffs fail to produce any evidence supporting the application of this theory to the instant case.  Simply including vaccines in one of many government contract bids and executing an agreement pursuant to that bid does not constitute "insistence" or "hindrance" of the government.  *See id.*  Indeed, Apexus's bid and agreement with HRSA appear to further the purposes of the prime vendor program.

Therefore, even construing the evidence in favor of plaintiff, Apexus has met its burden of showing that it is entitled to implied immunity as a matter of law.  For the foregoing reasons, the court will grant Apexus's motion for summary judgment on the grounds of conduct-based immunity.

GSK and SNHD argue that they should also be afforded conduct-based immunity because they similarly acted pursuant to and in conformance with the prime vendor program.  To be entitled to conduct-based implied immunity, a private party must be "acting at the direction or consent of the government agency . . . ." *Byers*, 600 F.3d at 295.

Notably, finding Apexus immune from antitrust liability but failing to hold the same for GSK and SNHD would insulate only certain actors in the statutory program.  However, the court

cannot find GSK and SNHD immune as a matter of law pursuant to the conduct-based immunity doctrine. Courts have generally applied conduct-based immunity only to the private parties contracting with a government agency. *See Byers*, 600 F.3d at 295; *Name.Space*, 202 F.3d at 582.

GSK and SNHD may have acted in compliance with the prime vendor program by selling and purchasing discounted vaccines. However, considering the Supreme Court's clear intention that implied immunity be narrowly construed, the court cannot find that GSK and SNHD were "acting at the direction" of HRSA in the same way as Apexus. *See id.* Neither party acted pursuant to a binding agreement with a government agency. Accordingly, the court will not grant summary judgment to GSK and SNHD on these grounds.

      B.      *Own-use exemption*

Alternatively, SNHD argues that the Nonprofit Institutions Act ("NPIA") covers its provision of vaccines, exempting this conduct from liability under the Robinson-Patman Act as SNHD's "own-use." Plaintiff responds that the conduct at issue exceeds the parameters of the own-use exemption, causing it to fall outside the NPIA and subjecting it to the Robinson-Patman Act.

SNHD was created pursuant to Nevada statute and meets the broad definition of a nonprofit institution under the NPIA. *See* NRS 439.361 *et seq.*; *De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388, 1391-92 (9th Cir. 1984). The NPIA covers and exempts from the Robinson-Patman Act any use that "promotes the [entity]'s intended institutional operation . . . ." *Abbott Labs.*, 425 U.S. at 14. In so doing, the NPIA aims "to permit institutions which are not in business for profit to operate as inexpensively as possible." *Logan Lanes, Inc. v. Brunswick Corp.*, 378 F.2d 212, 216 (9th Cir. 1967).

Plaintiff claims that SNHD's conduct exceeds its own use because it contracts with local employers to provide vaccines to their employees. Further, plaintiff cites the Supreme Court's decision in *Abbott Labs*, contending that any provision of vaccines to walk-in customers who are not existing SNHD patients exceeds the scope of the own-use exemption.

Not all pharmaceutical purchases by nonprofit institutions are exempt from the Robinson-Patman Act. *See Abbott Labs.*, 425 U.S. at 14 ("[J]ust because it is a nonprofit hospital that is

purchasing pharmaceutical products does not mean that all its purchases are exempt from Robinson-Patman . . . ."). In particular, the Supreme Court expressed concern in *Abbott Labs* that exempting a hospital's refills for former patients and sales of prescriptions to walk-in customers would hurt competing commercial pharmacies. *Id.* at 17-18.

However, the NPIA also applies to non-profit institutions other than hospitals. *See* 15 U.S.C. § 13c (exempting "purchases of their supplies for their own use by . . . hospitals, and charitable institutions not operated for profit"). The NPIA's application to a particular case is fact-specific, turning on the organization's purpose and functions. *See Logan Lanes, Inc. v. Brunswick Corp.*, 378 F.2d 212, 215 (9th Cir. 1967) (upholding exemption of university bowling equipment purchase from Robinson-Patman Act because university purposes encompassed student entertainment).

As the Ninth Circuit has established, nonprofit organizations may have broad institutional functions, and a wide array of activity may qualify as furthering these purposes under the NPIA. *See De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388, 1393 (9th Cir. 1984) (holding that all HMO drug resales to members qualify as "own-use" under NPIA). In so holding, the *De Modena* court noted the differing purposes of an HMO, often tasked with providing "preventive health care," and a hospital, offering services "on a temporary and usually remedial basis." *Id.*

SNHD is tasked by statute with maintaining public health in Clark County. *See* NRS 439.366(3) (giving district board of health the duty and authority to "[p]rotect and promote the public health generally in the geographical area subject to the jurisdiction of the health district"); Clark County Code § 3.08.070(b) (providing district boards of health with the power "to take whatever action that is necessary to control communicable diseases").

Preventing certain diseases requires widespread vaccination, and the fact that vaccine administration does not occur on the premises of a clinic may not be conclusive in determining qualification under the own-use exemption.[1] Blanket application of the *Abbott Labs* rule on walk-

---

[1] *See* Federal Trade Commission, Community CarePartners, Inc., Advisory Opinion, July 2, 2010, *available at* http://www.ftc.gov/policy/advisory-opinions/community-carepartners-inc (advising that NPIA exemption covers non-profit care organization's provision of discounted pharmaceuticals to in-home hospice patients, regardless of whether such pharmaceuticals are administered in a medical facility).

in customers to non-profit institutions other than hospitals could inhibit the operation of those entities entirely.

Likely many, if not all, of SNHD's health services occur on a "walk-in" basis. SNHD does not admit patients as a hospital would. Instead, it serves the community through the operation of health clinics and the provision of preventative health services. As a result, holding that SNHD's vaccinations are not exempt under *Abbott Labs* because they are not provided to "patients" would produce an unnecessarily narrow result. Additionally, this conclusion would likely hinder SNHD's statutory purpose of maintaining public health in Southern Nevada.

Regardless of where and to whom SNHD provides vaccines, it operates on a not-for-profit basis. Any fees that SNHD charges go into its general fund, and its controlling statute mandates that this money be spent for public health purposes only. Because SNHD's sale of vaccines furthers its institutional purpose, the court finds that the conduct at issue is covered by the own-use exemption to the Robinson-Patman Act. Accordingly, the Robinson-Patman Act is inapplicable to SNHD's conduct and SNHD is entitled to judgment as a matter of law on this issue.

Because plaintiff has no viable claim against SNHD under the Robinson-Patman Act, Apexus and GSK also could not be liable for the same alleged discriminatory conduct.[2] Accordingly, even if the conduct-based immunity doctrine did not apply to Apexus, the court finds it appropriate to grant each defendant's motion for summary judgment.

C. *State law claims*

Considering the court's ruling on the instant motions, the only remaining claims in this suit are plaintiff's state law claims against SNHD for violations of the Nevada Unfair Trade Practice Act and intentional interference with prospective economic advantage. (Doc. # 154).

The court therefore declines to exercise supplemental jurisdiction over plaintiff's remaining state law causes of action. *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996) (holding that "where a district court dismisses a federal claim, leaving only state claims for

---

[2] Apexus argues that a cause of action for aiding and abetting violations of the Robinson-Patman Act does not exist under federal law. The court will not address this argument because, even if a cause of action did exist, the court finds that SNHD's conduct was exempt from liability under the own-use exception. Thus, there were no violations of the Robinson-Patman Act for Apexus to allegedly aid or abet.

resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice").

Based on the foregoing, plaintiff's remaining state law claims will be dismissed without prejudice.

### D. Motion to strike

Apexus also moves to strike certain exhibits included with plaintiff's consolidated response to defendants' motions for summary judgment. In light of the instant findings, the court will deny the motion to strike as moot.

## IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant Apexus, Inc.'s motion for summary judgment, (doc. # 158), be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant Southern Nevada Health District's motion for summary judgment, (doc. # 161), be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant GlaxoSmithKline, Inc.'s amended motion for summary judgment, (doc. # 168), be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant Apexus, Inc.'s motion to strike, (doc. # 180), be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that plaintiff's remaining state law claims be, and the same hereby are, DISMISSED without prejudice.

The clerk shall enter judgment accordingly and close the case.

DATED THIS 28th day of October 2014.

_____
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE